### BROCKWAY v. LASCALA AND OTHERS.

A passenger carrier is bound to carry as safe as human foresight or the utmost care and diligence of a cautious person will permit, and if he cannot maintain an absolute barrier against danger, it is his next duty to warn his passengers, and, if he omits such warning, he will be liable for any injury caused by that danger.

If the passenger, in such case, disregards the warning, he takes the risk of injury on himself, and exonerates the carrier.

THE defendants were proprietors of the Fulton street ferry, between the cities of New York and Brooklyn, on which they ran steamboats for the carriage of passengers, teams and goods.

The boats had rounded ends, which fitted into semi-circular places prepared in the bridges at both ends of the route, and when they entered the slips at the ends of which the bridges were placed, they were fastened to the bridges by chains which could be wound up by windlasses on the bridges, until the boats and the bridges fitted close together and made the passage to and from the boats safe. Owing to the running of the tide, the boats seldom came into the slips so straight as to fit the curves in the bridges, but it often took time to make such fit by winding up the chain.

During the time thus consumed passengers would become impatient and would rush on and off the boats when there was still an opening between the bridge and the boat.

The boats and bridges were prepared with three passages, one on each side for foot passengers, and one in the center for carriages. On the boats there were chains across the carriage way, but none across the others, and that chain was frequently let down before the boat was moored fast to the bridge and the letting it down was often understood by the passengers as a signal that the boat was in a safe condition to enter or leave.

In the night-time lamps were kept burning on the bridges, so located as to show where the boats and the bridges fitted together, but generally the crowd was so great at that spot as to render it difficult to see that.

The plaintiff was a stranger from the country, and unfamiliar with the mode of using the boats. He was crossing one evening, when, without inquiry, he started to go ashore when he saw other passengers going, but the boat was not yet fastened to the bridge, and he stepped one leg into the chasm, and before he could be extricated the boat moved up to the bridge and crushed his leg, so badly that it had to be amputated.

It was a dark, foggy night, and the plaintiff wore spectacles with colored glasses at the side, and it was proved that no precautions were taken about passengers going ashore; no warnings of danger given, and no barriers provided against passing off and on at pleasure, the chains on the boats being intended merely to keep back cattle and carriages, and also that accidents were not unfrequent from passengers stepping or falling into the chasm between the boats and bridges.

*A. Tabor and F. B. Cutting*, for plaintiff, insisted that defendants had been wanting in due care in two respects — one, in not having light enough on the bridge, and the other in not having taken any precautions against the manifest danger of getting between the bridges and the boats.

*J. Dikeman, C. P. Smith and George Moore*, for defendants, insisted:

1. That it was carelessness on the part of the plaintiff, in not making some inquiry and some examination before attempting to go ashore, and especially when he was a stranger, with vision obscured, if not impaired, and the chasm into which he stepped being visible to any one who would choose to look.

2. That the light on the bridge was sufficient.

3. That it was not the duty of the defendants to erect bar-

Brockway v. Lascala and others.

riers against passengers leaving the boat before entirely moored to the bridge; that passengers always had been in the habit of going ashore at their pleasure, and for that purpose had removed chains and bars that had been put up as barriers.

4. That it was not the duty of the defendants to give the passengers any warning of the danger, for it was self-evident that there would be danger in leaving the boat before it was properly moored in its place.

*The Circuit Judge* charged that if the injury which the plaintiff had sustained was the result of inevitable accident, or was in any manner caused by or contributed to by his own negligence, he could not recover.

But if neither of these things were made out, then the inquiry was, what was the duty of the defendants, and had they performed it?

A common carrier undertakes to carry safely, and deliver properly all goods received by him for carriage, and it is the act of God or the common enemy that can alone excuse him. It would be enough to obtain a recovery in such case, to prove the reception of the goods by the carrier, and their non-delivery as contracted for.

But the obligation of a passenger carrier is different. He only warrants that he will carry safely as far as human foresight or the utmost care and diligence of a cautious person will permit. Hence, in such case, something more must be proved than the mere reception of the passenger and his non-delivery in safety. It must also be shown that there has been wanting some of that required foresight and care, and that from that the injury has resulted.

Ferry boats may and do occupy both positions. As to goods, they are liable to the obligation of a common carrier. As to passengers, to the obligation of the passenger carrier.

This action was founded on the obligation of the passenger carrier, and therefore the inquiry was, had any want of due care and diligence on the part of the defendants been shown?

As to the deficiency of light on the bridge, that was purely

a question of fact, in respect to which the jury could require no instruction.

But the other question—whether the defendants were bound to take any measures to guard against the danger of landing—was quite a grave one, and on that he would give them his views.

The danger of falling into the chasm between the bridges and the boats, when landing, was quite apparent and not uncommon, so that both passengers and carriers were aware that it was imminent on every trip.

Did the ferry company owe any duty toward their passengers to guard them against it?

They thought not—they therefore took no precautions, but left their passengers to draw their own inferences from the ringing of the engine bell, from the striking of the boat against the slip or bridge, from the dropping of the carriage barrier chain, from the turning of the windlass, and from the passengers moving to go ashore. But that they ought to do more was to be determined by the question, whether human foresight and the utmost care and diligence of a cautious person could suggest any thing more? Because, if they could, then it was the duty of the defendants to adopt that something more.

It was not for the court or jury to declare what those precautions ought to be; it would be enough to know that any had been omitted that might have been adopted, to the protection of the passengers. Suppose the barrier chain had been extended across the passenger ways as well as the carriage ways, with such precautions that it could not be let down until the boats were fastened to the bridges? Or suppose that men were stationed on the bridge to warn in a loud voice against the danger?

It might well be impracticable, and even increase the dangers of travel, to erect and maintain barriers whereby passengers might be forcibly detained on board until the proper time. In such case a proper warning of the danger would be sufficient; and, if such warning could contribute to the safety of the pas-

sengers it would be a breach of duty to omit it, and would render the carrier liable for any injury that might have been prevented by it. If the passenger disregarded the warning he would take the risk of injury on himself. The carrier, in that case, would have done his duty, and the question in this case was simply whether it had been done here, and if it had been, whether plaintiff's safety would have been consulted?

Where an absolute barrier cannot be maintained, the next duty was a warning against danger, and that the carrier has no right to omit.